* * * * * * * * * * *
The Full Commission has reviewed the Deputy Commissioner's Opinion and Award based upon the record of the proceedings before the Deputy Commissioner and the briefs and oral arguments before the Full Commission. The appealing parties have not shown good grounds to reconsider the evidence, receive further evidence or rehear the parties or their representatives. The Full Commission hereby AFFIRMS with some modifications the Opinion and Award of Deputy Commissioner Deluca.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS *Page 2 
1. All parties are properly before the Industrial Commission and the Industrial Commission has jurisdiction over this matter.
2. All parties are subject to and bound by the North Carolina Workers Compensation Act.
3. All parties have been properly designated, and there is no question as to misjoinder or non-joinder of parties.
4. At all times relevant hereto, the employment relationship existed between Ronald Reaves (hereinafter "decedent") and defendant-employer.
5. American Interstate Insurance is the proper insurance carrier for this claim.
6. Plaintiff's average weekly wage was $883.75, which results in a compensation rate of $589.16.
7. Stipulated Exhibits 1 — 9 were entered into the record before the Deputy Commissioner.
8. The issues before the Commission are whether the deceased employee's death arose out of and in the course of his employment with defendant-employer and, if so, to what benefits is his surviving spouse entitled.
 * * * * * * * * * * *
Based upon the foregoing stipulations and competent evidence of record, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of his death, decedent was a 54-year-old man working for defendant-employer as a welder. *Page 3 
2. At no time prior to April 1, 2004 had decedent complained of heart problems or tightness in his chest. On January 16, 2004, decedent underwent a physical examination at North Brunswick Family Medicine in Leland, North Carolina, where his blood pressure was noted as being 120/80, his resting heart rate at 76 beats per minute, and no history of "cardiovascular disease."
3. On May 31, 2004, decedent and Robert Templeman traveled from Leland, North Carolina to Franklin, Virginia where they were to work as a two-man team to repair a pump at the International Paper (IP) mill. Mr. Templeman was a machinist for defendant-employer and had been since January 2001. Mr. Templeman had known decedent since being hired by defendant-employer. Mr. Templeman and decedent were friends.
4. Once in Franklin, the two men got separate hotel rooms and got a night's rest before the next day's work.
5. Although having a two-man crew was not a normal operating procedure, only two men were required for the job at the IP mill in Franklin because the IP mill workers were doing the pump teardown work, which would normally have been performed by the other two men on a four-man IPS team. Thus, a two-man team was adequate for this job.
6. The job at IP was to be a one-day job, and the two men were expecting to work their standard 12-hour shift. According to Mr. Templeman, both he and decedent were used to these work hours and types of work. Mr. Templeman was the only person with decedent throughout most of the day on April 1, 2004. Mr. Templeman's testimony was taken both at a pre-hearing deposition and at the Deputy Commissioner's hearing. Mr. Templeman testified credibly on both occasions. *Page 4 
7. On the morning of April 1, 2004, decedent and Mr. Templeman arrived at the IP mill around 7:00 a.m. However, the mill employees had not torn down the pump, so decedent and Mr. Templeman did not begin work until about 10:00 that morning. Between 7:00 a.m. and 10:00 a.m., Mr. Templeman and decedent got their equipment ready, participated in a safety orientation and took a coffee break.
8. The job at the IP mill that day was performed in temperatures cooler than temperatures under which plaintiff normally worked. Mr. Templeman and decedent worked in a pump room in the basement of the IP mill that was described as having 15-18 foot ceilings and being 30 feet wide by 40 feet deep. Mr. Templeman testified that the temperature in the pump room was in the mid-80's and that inside the mill was hotter and more humid than outside the mill.
9. There was an entrance to the room 30-35 feet away from the pump where decedent and Mr. Templeman were working and that entrance consisted of a 10 x 12 foot opening into a well-ventilated hallway. The access hallway was 5 to 10 degrees cooler than the pump room. An upright fan was placed 20-25 feet from where decedent and Mr. Templeman were working.
10. Once the pump disassembly was completed by the IP employees, decedent and Mr. Templeman lifted the lathe up to the pump shaft and set it. That part of the job took about 10 minutes.
11. Both men then set up their tools around the pump, put up lights and located power. That part of the job took less than one hour. *Page 5 
12. Mr. Templeman, by himself, then "indicated" the machine (lathe). That portion of the job took half of an hour. Decedent was not engaged in physical labor during that half an hour.
13. Mr. Templeman, by himself, then "undercut" the shaft. That job took approximately three hours and ended some time around 2:00 p.m. During this time, decedent was in and out of the pump room but was not actually working on the pump. Mr. Templeman described this as "down time" for decedent during which he took smoke breaks.
14. Both men then got the metal sleeve provided by IP and heated it up so that it would expand, which allowed the sleeve to be mounted on the pump shaft. Decedent used the torch to heat the sleeve to 300 degrees and Mr. Templeman held the sleeve. That portion of the job took approximately 15 minutes.
15. Decedent then tack welded the sleeve to the pump. That portion of the job took about half an hour. The welding duties were decedent's main tasks to be performed at the IP facility.
16. Both men then took a break to wait for the pump to cool down before they could continue working. During that break, the two men went to lunch. After the break, work started up sometime between 4:00 and 5:00 p.m. The two men took at least five breaks during the work on the day in question.
17. Mr. Templeman then finished machining the sleeve and the shaft of the pump. That portion of the job took approximately four hours. During this time, decedent was not actually working on the pump.
18. At approximately 7:00 p.m., decedent told Mr. Templeman that "he wasn't feeling good" and was going outside in a hallway to sit down. This was the first time that Mr. *Page 6 
Templeman recalled decedent had to walk out of a job site complaining of not feeling well and being hot.
19. At approximately 10:30 p.m., decedent again complained that he was "hot and fatigued" and Mr. Templeman suggested that he go outside and take a break.
20. Mr. Templeman walked with decedent to their work truck, located outside at the entrance to the mill, and decedent got into the truck unassisted while Mr. Templeman went back into the mill to finish his clean up. Mr. Templeman testified that there was nothing about decedent's condition or complaints that caused him any alarm.
21. Approximately 45 minutes later, Mr. Templeman went back to the truck and found decedent lying in a reclined position. He tapped on the window, and when there was no response from decedent, Mr. Templeman went to the medical office to seek help. However, by that time, decedent had died.
22. An autopsy was performed on April 2, 2004, in which the medical examiner noted that: "The decedent was a 54 year old white man with no known significant past medical history apart from recent ear ache. While he was at work he complained of feeling hot. He was later found collapsed inside of a vehicle. At autopsy the decedent had evidence of severe atherosclerotic cardiovascular disease. . . .Cause of death: Coronary artery disease."
23. On April 1, 2004, Mr. Templeman did about nine hours of physical labor and decedent did between three and four hours of physical labor. Decedent sat down most of the time he was working. The job performed at the IP mill that day was easier than most of the work decedent normally performed and the IP job was no hotter or more fatiguing than any of their other 12-hour jobs. *Page 7 
24. Although conflicting testimony was offered, the Full Commission finds as fact that Mr. Templeman did not observe decedent sweating profusely on the night of April 1, 2004.
25. Debra S. Meurs testified as an expert in industrial safety. She is the Environmental Compliance Specialist for the City of Greensboro and the owner of a safety and environmental company, with over 30 years of experience in industrial safety. Ms. Meurs reviewed the circumstances surrounding the death of decedent. In preparation for her testimony, Ms. Meurs reviewed defendant-employer's Safety Manual, all of the documentation provided in discovery by defendants pertaining to decedent and Mr. Templeman's safety training, the various accident investigation reports, the Industrial Commission documents, and decedent and Mr. Templeman's employment files provided by defendants during discovery, all of which are a part of the record in this matter in the form of stipulated exhibits.
26. Ms. Meurs was of the opinion that on April 1, 2004, decedent was subjected to a work hazard, namely, a hot and humid workspace, with poor ventilation. According to Ms. Meurs, OSHA regulations required defendant-employer to properly train decedent and Mr. Templeman in the recognition and response to the presence of work hazards, and no documentation exists that either decedent or Mr. Templeman had received such training.
27. Ms. Meurs believed that Mr. Templeman's response to decedent's complaint was inadequate, and that decedent should have been taken to a medical facility. Mr. Templeman's response, according to Ms. Meurs, is attributable to his lack of training, and his actions on April 1, 2004, contributed to decedent's death.
28. Dr. William Holt, a board certified cardiologist in Wilmington, reviewed the autopsy report, office records from Wilmington Health Associates, and various documents concerning the death of decedent. Dr. Holt did not review the transcript of Mr. Templeman's *Page 8 
deposition or hearing testimony. Dr. Holt characterized decedent's health prior to April 1, 2004 as "good" with no record of any impairment whatsoever.
29. Dr. Holt's information about decedent's work conditions on April 1, 2004, was that the area was hot. According to Dr. Holt, poor ventilation and heat increase the stress on the cardiovascular system, which can lower the blood pressure and create additional stressors on the heart.
30. The autopsy finding of "no thrombosis" was significant to Dr. Holt, as it meant that decedent did not have a "myocardial infarction, which is a heart attack in layman's terms." Dr. Holt was of the opinion that decedent had a rhythm problem in his heart due to a lack of blood supply to the heart muscle, which was aggravated by the heat and other work conditions to which decedent was exposed on April 1, 2004.
31. Dr. Holt believed that had decedent been taken to an EMT or other medical professional when he complained of feeling ill, decedent would have been properly examined and assessed and appropriate treatment provided, including using a defibrillator if decedent had suffered an arrhythmia.
32. It was Dr. Holt's understanding that plaintiff was doing hard labor for long hours in a hot room. Dr. Holt stated that the work conditions to which decedent was exposed on April 1, 2004, were significant contributing factors in decedent's death. Although the autopsy and death certificate did not state that decedent had suffered a heat stroke or heat exhaustion, Dr. Holt assumed that decedent was overheated, dehydrated and had low blood pressure.
33. However, Dr. Holt admitted that he had no knowledge of the actual working conditions decedent and Mr. Templeman were subjected to on April 1, 2004. He did not know how hot it was in the pump room or anything about the ventilation in or around the pump room *Page 9 
where the two men were working. Dr. Holt assumed decedent worked from 7:00 a.m. to 10:30 p.m., but did not know if decedent was actually performing physical labor during the entire time. Dr. Holt did not know what type of work decedent had performed, how strenuous the work was for decedent, or how many people decedent was working with on the date of his death. Dr. Holt did not know if decedent took any breaks during the day on April 1, 2004, how long a lunch break he took, or the amount of fluids decedent consumed on the date of his death.
34. Dr. Arthur Davis, who is board certified in clinical and anatomic pathology and who specializes in the pathology of heart attacks, testified as an expert witness in this case. Dr. Davis reviewed the deposition transcripts of Mr. Templeman, Dr. Holt, and decedent's wife, as well as the documentary evidence relied upon by Dr. Holt. Through the deposition testimony of Mr. Templeman, Dr. Davis was knowledgeable about the conditions under which decedent worked and it was his opinion that decedent's work conditions were not a significant contributing factor to decedent's death. Based upon his review of the evidence presented to him, Dr. Davis believed that the working conditions were not excessively hot or humid, that decedent did very limited physical work since he welded only briefly, and that he had a lunch break as well as more than five breaks to smoke cigarettes.
35. Dr. Davis testified that decedent died from a dysrhythmia followed by an arrhythmia, or heart attack. He further testified that the symptoms of an acute heart attack are non-specific and that there would have been no way, without diagnostic testing, for a doctor or layperson to tell what was wrong with decedent or if his complaints were significant.
36. Because the expert opinions of Dr. Davis were based on his extensive knowledge about the circumstances surrounding decedent's death, as opposed to Dr. Holt's limited knowledge, the Full Commission gives greater weight to the testimony of Dr. Davis than to the *Page 10 
testimony of Dr. Holt and finds that decedent's death was not caused by extraordinary exertion or by exposure to a greater hazard or risk than that to which decedent was otherwise exposed and therefore did not arise out of his employment with defendant-employer.
37. Decedent's work was not a significant causative factor in his death. Several hours elapsed between the time that decedent performed the welding on the project and the time when he first complained of not feeling well. Furthermore, although the record is silent on how much fluid decedent took in while at work on April 1, 2004, decedent did take several breaks during that day and had opportunity to maintain his fluid levels. These breaks also afforded decedent ample opportunity to go into the hallway, which was several degrees cooler than the pump room.
38. The Full Commission finds that there is insufficient evidence of record from which to prove by the greater weight that decedent's death was caused by the willful failure of defendant-employer to comply with any statutory requirements.
 * * * * * * * * * * *
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. To be compensable under the Workers' Compensation Act, an injury must result from an "accident arising out of and in the course of the employment. . . ." N.C. Gen. Stat. § 97-2(6). In the case before us, the evidence is uncontradicted that decedent's death on April 1, 2004, occurred in the course and scope of his employment. Decedent was working for defendant-employer at the job site at the time of his death.
2. The issue before the Commission, therefore, is whether decedent's death arose out of the employment. In general, an injury does not arise by accident if it happens when an *Page 11 
employee is performing his normal duties in the usual way. Lawrence v.Mill, 265 N.C. 329, 144 S.E.2d 3 (1965). The courts have also held that in order to be compensable, injuries caused by a heart attack must be precipitated by unusual or extraordinary exertion or by occupational exposure to heat or cold. Dillingham v. Yeargin Construction Co.,320 N.C. 499, 358 S.E.2d 380 (1987); Fields v. Plumbing Co., 224 N.C. 841,32 S.E.2d 623 (1945). The Supreme Court in Fields stated:
 [W]here the employment subjects a workman to a special or particular hazard from the elements, such as excessive heat or cold, likely to produce sunstroke or freezing, death or disability resulting from such cause usually comes within the purview of the compensation acts. . . . The test is whether the employment subjects the workman to a greater hazard or risk than that to which he otherwise would be exposed.
 Id. at 842-43, 32 S.E.2d at 624.
3. The greater weight of the evidence showed that decedent's job duties at the IP mill in Franklin, from a physical standpoint, were easier than most of the jobs he performed and that decedent worked in the same temperatures as those to which he was normally exposed. Therefore, the employment did not subject decedent to a greater risk or hazard than that to which he was normally exposed. Madison v. International Paper Company,165 N.C. App. 144, 598 S.E.2d 196 (2004). Decedent's working conditions did not involve unusual or extraordinary exertion or excessive exposure to heat. The greater weight of the evidence also failed to show that the conditions of decedent's employment placed him at a greater risk of overheating than members of the general public not so employed.Dillingham v. Yeargin Construction Co., supra. Therefore, decedent's death, which occurred on April 1, 2004, was not the result of an injury by accident arising out of decedent's employment with defendant-employer. N.C. Gen. Stat. § 97-2(6). *Page 12 
4. The death of decedent was not caused by the willful failure of defendant-employer to comply with any statutory requirement. N.C. Gen. Stat. § 97-12(3).
 * * * * * * * * * * *
Based upon the foregoing Stipulations, Findings of Fact and Conclusions of Law, the Full Commission makes the following:
 AWARD
1. Plaintiff's claim for workers' compensation benefits as the result of the death of decedent is hereby denied.
2. Each side shall pay the costs.
This the 5th day of June 2007.
 S/ _____________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/ _____________ BUCK LATTIMORE CHAIRMAN
 S/ _____________ CHRISTOPHER SCOTT COMMISSIONER *Page 1